UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

Case No.: 25-CR-111-JPS

v.

MICHAEL G. CEMAN,

Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Robert J. Brady, Jr., Assistant United States Attorney, and the defendant, Michael G. Ceman, individually and by attorney John W. Campion, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

## CHARGE

2.      The defendant has been charged in an Information, which alleges a violation of Title 18, United States Code, Sections 922(a)(1)(A) and 924(a)(1)(D).

3.      The defendant has read and fully understands the charge contained in the information. He fully understands the nature and elements of the crime with which he has been charged, and that charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.     The defendant voluntarily agrees to plead guilty to the following charge set forth in full as follows:

**THE UNITED STATES ATTORNEY CHARGES THAT:**

Beginning on or about September 12, 2016, and continuing until on or about December 10, 2024, in the State and Eastern District of Wisconsin,

**MICHAEL G. CEMAN,**

not being a licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, willfully engaged in the business of dealing in firearms.

In violation of Title 18, United States Code, Sections 922(a)(1)(A) and 924(a)(1)(D).

6.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt.  The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

*CEMAN's unlicensed sales of firearms through mid-2016 and ATF warning*

In September 2014, ATF Milwaukee Industry Operations (IO) received a referral from the State of Wisconsin Department of Justice (WDOJ) Crime Information Bureau regarding firearms purchases by Michael G. CEMAN from Federal Firearms Licensee (FFL) J.L., operating as Lauritzen Enterprises.  The referral indicated that CEMAN seemed to be structuring handgun purchases in a manner to avoid multiple sales reporting on ATF Form 3310.4 – Report of Multiple Sale or Disposition of Pistols or Revolvers ("Report of Multiple Sale"), and that CEMAN had asked J.L. to submit separate background checks to the WDOJ Firearms Unit for each purchased handgun, despite his having purchased more than one handgun on the same occasion. CEMAN reportedly believed that if individual handguns were purchased with separate background checks, even when purchased at the same time, then a Report of Multiple Sale need not be submitted to ATF.  The referral also stated J.L. did not understand that multiple handgun sales must be reported if transfers occurred with the same purchaser within five-business days.  Due to this apparent reporting noncompliance, IO Investigator (IOI) Miguel Ruiz initiated a compliance inspection of Lauritzen Enterprises on December 1, 2014, resulting in citations for violations, which included failure to submit multiple handgun sales reports.  J.L. later informed IOI Ruiz that he told CEMAN

2

about the violations found during ATF's inspection and that he explained the need to report multiple firearms sales. In May 2016, IOI Ruiz identified and reviewed firearms purchases made by CEMAN from March 2015 to May 2016 and concluded that CEMAN was structuring purchases at several different FFLs to avoid the multiple-sales reporting requirement. As a result, on May 16, 2016, IOI Ruiz sent a referral to the ATF Milwaukee Criminal Enforcement (CE) division to investigate CEMAN's firearms purchases.

On May 26, 2016, ATF Special Agent Sandra DeValkenaere opened an investigation into CEMAN's potential violations of Federal firearms laws. At this time, SA DeValkenaere determined that CEMAN conducted 15 purchases of multiple firearms, including purchasing more than one handgun/revolver within a five-day period from the same FFL. SA DeValkenaere also determined that law enforcement recovered 3 firearms, traced to CEMAN, during firearms-related offenses. Specifically, those recoveries were by US Customs in Virginia – 761-day Time to Crime (TTC);[1] the Brown County Sheriff's Office in Green Bay, WI – 356-day TTC; and the Milwaukee Police Department in Milwaukee, WI – 321-day TTC. SA DeValkenaere also determined that CEMAN had purchased firearms from at least 10 different FFLs.

On June 6, 2016, SA DeValkenaere and a Green Lake County Sheriff's Office Deputy met with CEMAN at his residence. When SA DeValkenaere confronted CEMAN about the three recovered firearms traced to him, he said he likely sold those firearms at a gun show in Fond du lac, Oshkosh, or West Bend, Wisconsin. CEMAN said he did not keep records of his firearms sales. SA DeValkenaere served CEMAN with an ATF "Warning Notice of Unlicensed Dealing of Firearms in Violation of Federal Law," which he signed. CEMAN said he understood that he could not sell firearms without first obtaining a Federal firearms license. When CEMAN asked how to apply for such a license, SA DeValkenaere replied that he could find the application at www.atf.gov. Believing CEMAN would discontinue selling firearms without a license, SA DeValkenaere closed her investigation into CEMAN.

*CEMAN's continued unlicensed sale of firearms through December 2024*

In December 2023, IOI Ruiz conducted a compliance inspection at FFL Wildo Corp., d/b/a Holliday Food & Sport, in Waupun, WI. The inspection covered the December 12, 2022 through December 12, 2023 timeframe. During this one-year period, CEMAN had purchased 101 firearms from Holliday Food & Sport in Waupun, WI. IOI Ruiz also determined that CEMAN had made additional firearms purchases from this FFL prior to December 12, 2022. IOI Ruiz observed that CEMAN still appeared to be structuring his purchases to avoid the multiple sales reporting requirement. On March 4, 2024, IOI Ruiz referred this matter to the ATF Milwaukee CE division for investigation. The ATF CE initiated an investigation into CEMAN's suspected continued unlicensed sale of firearms.

At the beginning of the investigation, the ATF CE identified 12 instances between June 2015 and August 2024 when firearms, originally purchased by CEMAN, were recovered during

---

[1] Time to Crime (TTC) is the amount of time from when the firearm is originally purchased to when it is recovered by law enforcement.

Case 2:25-cr-00111-JPS    Filed 05/29/25    Page 3 of 16    Document 2

firearms-related offenses.[2] SA Kurtzweil noted that eight of these recovered firearms had been purchased by CEMAN after SA DeValkenaere served him with the June 6, 2016 ATF warning notice. SA Kurtzweil determined that between May 8, 2024, and December 5, 2024, CEMAN purchased at least 77 firearms from 6 different FFLs, with 26 firearms having been purchased since October 1, 2024. Given CEMAN's numerous firearms purchases and his history of unlicensed firearms sales, the ATF CE suspected CEMAN had been building an inventory of firearms to again engage in their unlicensed sale.

SA Kurtzweil determined, based on records from the Wisconsin DOJ Firearms Unit, Verizon phone records, and a completed Wisconsin firearms form, that CEMAN's cellular telephone number was 920-539-9279. Phone records indicated that between April 4, 2023, and March 3, 2024, the user of 920-539-9279 called seven distinct FFLs. Based on historical cell site records, between August 1, 2023, and August 30, 2024, the device assigned call number 920-539-9279 used cell towers in approximately the same areas where, and during the same dates and times when, a gun show was being held. Specifically, during this timeframe, the device was in the vicinity of 13 distinct gun shows on 16 different occasions, including the Central Wisconsin Gun Collectors Show on October 21, 2023, and January 20, 2024. Based on evidence that CEMAN attended two previous Central Wisconsin Gun Collectors Shows, the ATF CE anticipated CEMAN would attend the Central Wisconsin Gun Collectors Show scheduled for October 19 and 20, 2024, where he would have the opportunity to sell any number of firearms that he had recently acquired.

On October 19, 2024, location data for the device assigned number 920-539-9279 indicated it was traveling from CEMAN's home (N2XXX County Road Q, Markesan, Wisconsin 53946) to the Fond du Lac County Fairgrounds, in Fond du Lac Wisconsin, where the Central Wisconsin Gun Show was being held. Based on this information, investigators responded to the Fond du Lac County Fairgrounds. At approximately 9:14 a.m., ATF Task Force Officer (TFO) Vance Henning observed CEMAN arrive and park at the Expo Center at the Fond du Lac County Fairgrounds in a red 2011 Chevrolet Silverado pickup truck. CEMAN exited the vehicle and walked toward the Expo Center with a handgun case under one arm and carrying an orange cloth bag that contained square boxes. Based on TFO Henning's training and experience, those boxes were consistent with the size and appearance of handgun boxes/cases. At approximately 10:30 a.m., ATF Special Agent (SA) Brad Kurtzweil entered the Expo Center and observed CEMAN sitting at the end of a table where multiple firearms were displayed for sale. SA Kurtzweil could not determine if any of the displayed firearms belonged to CEMAN. However, SA Kurtzweil noted that CEMAN's orange cloth bag, which was laying by his feet, contained no handgun cases/boxes. Several unknown males were seated at the table with CEMAN. CEMAN eventually went to another exhibitor's table where he obtained what appeared to be an ammunition can. CEMAN returned to his table and placed the ammunition can inside his orange cloth bag. At approximately 11:42 a.m., CEMAN left the Expo Center without the firearms he appeared to have when he first arrived at the gun show. He then departed the location in his vehicle.

---

[2] The 12 recoveries are as follows: Customs and Border Protection (CBP) in Norfolk, VA (1 firearm); Brown County Sheriff's Office in Green Bay WI (1 firearm); Milwaukee Police Department in Milwaukee, WI (3 firearms); Drug Enforcement Agency (DEA) in Milwaukee, WI (1 firearm); Brooklyn Park Police Department in Brooklyn Park, MN (1 firearm); Clark County Sheriff's Office in Vancouver, WA (1 firearm); Waukegan Police Department in Waukegan, IL (1 firearm); Madison Police Department in Madison, WI (2 firearms); and St Francis Police Department in St. Francis, WI (1 firearm). The TTCs for the 12 recoveries ranged between 259 and 1596 days.

4

Between December 6, 2024, and December 8, 2024, CEMAN attended the Oshkosh gun show at the Winnebago County Fairgrounds Expo Center. Surveillance footage captured CEMAN bringing what appeared to be firearms into the Expo Center, placing them on a table, and offering them to sell to gun show attendees. On December 7, 2024, at about 11:02 a.m., surveillance shows CEMAN selling a firearm to a gun show attendee.

*Search of CEMAN's residence*

On December 6, 2024, the ATF CE obtained a federal warrant to search CEMAN's residence (N2XXX County Road Q, Markesan, Wisconsin 53946) and his red 2011 Chevrolet Silverado pickup truck. On December 10, 2024, as SA Kurtzweil initiated the search, he informed CEMAN that he suspected CEMAN had been dealing firearms without a license. CEMAN asked if selling firearms was illegal. SA Kurtzweil responded that CEMAN appeared to be illegally selling firearms. When asked if he had firearms in his home, CEMAN replied he estimated he had "100" firearms in his home, and remarked, "I do, I mean I'll admit it; yes, I am, I am selling them." SA Kurtzweil told CEMAN that he was not under arrest and would not be arrested during the execution of the search warrant. Upon searching CEMAN's residence, investigators found 50 firearms, i.e., 14 rifles, 18 shotguns, and 18 handguns (specifically identified in the forfeiture provision of the information). Investigators found the firearms in the basement of the residence. Several firearms still had price tags affixed to them. They also found a handwritten ledger, business cards, firearms paperwork, and miscellaneous receipts.

The ledger, covering the time between September 12, 2016, and December 9, 2024, listed 1,214 firearms, indicating each firearm's manufacturer, model, and caliber. For each firearm, the ledger also indicated a corresponding price and date. On October 19, 2024, CEMAN was at the Central Wisconsin Gun Show in Fond du Lac, Wisconsin. For the same date, the ledger listed two firearms: a Keltec P-32, .32 caliber semi-automatic pistol, priced at $225.00; and a Marlin XT-22, .22 caliber rifle, priced at $225. On December 8, 2024, CEMAN attended a gun show in Oshkosh, Wisconsin. For the same date, the ledger listed a firearm: an XD-9, 9mm pistol, priced at $300.

As authorized by the warrant, investigators seized CEMAN's cellular device and downloaded its contents. Following CEMAN's post-*Miranda* interview (detailed below), the investigators returned his cellular device to him following the data extraction. The contents of the device include substantial information concerning firearms, including the purchase and sale of firearms. For instance, the device contained several firearms-related documents (e.g., firearms owner's manuals, Wisconsin firearms regulations, gun-show guides, etc.), numerous images of firearms and firearms parts, several images of distinct individuals' photo identifications, and its contacts section listed several "names" referencing firearms. The device also contained numerous instant messages relating to firearms transactions. CEMAN often identified himself (e.g., "This is Mike Ceman.") in these instant messages. Numerous individuals sent messages seeking specific types of firearms. In response, CEMAN would not only indicate he had firearms for sale, but the types of firearms that he messaged were available also often varied, suggesting he had a rotating inventory of firearms.

5

*Interview of CEMAN*

On December 10, 2024, ATF Special Agents Kurtzweil and Matt Bammert conducted a recorded interview of CEMAN at his residence. Prior to the interview, the agents told CEMAN he was not under arrest. Nonetheless, the agents advised CEMAN of his *Miranda* rights. CEMAN indicated that he understood his rights and agreed to speak with the agents. Regarding his firearms sales, CEMAN said that he had not kept records of those to whom he sold firearms, but that he always asked to see their identifications, which he often photographed. As noted above, images of several photo IDs were recovered from CEMAN's cellular device. CEMAN said he had friends who, like him, also purchased firearms and resold them at gun shows. Regarding the October 19, 2024 gun show in Fond du Lac, CEMAN said he brought handguns to the gun show, which he sold to other vendors. He also said he successfully sold firearms at the Oshkosh gun show between December 6, 2024, and December 8, 2024. CEMAN said he made "very little" or "broke even" selling firearms and estimated that he lost money on "30 percent" of his sales. CEMAN said he purchased his own inventory. CEMAN estimated that he had purchased 100 firearms since January 2024, and that he had also sold at least 100 firearms that year. He said none of the firearms found in his basement were family heirlooms or belonged to anyone else. The firearms he intended to sell were separated from those that he used, which were in a safe. CEMAN said the time between when he purchased a firearm and resold it varied, ranging between a quick turnaround to up to two years. CEMAN terminated the interview.

K.C., CEMAN's wife, subsequently arrived at the residence. CEMAN did not object to SA Kurtzweil speaking with K.C. After SA Kurtzweil explained the nature of the investigation, including the fact that CEMAN had been notified in 2016 to refrain from selling firearms, K.C. said, "Hold on," and asked CEMAN, "Did you understand the letter?" CEMAN replied, "Yes, they told me to stop selling guns."

Accordingly, between September 12, 2016, and December 10, 2024, Michael G. CEMAN, the defendant, in the Eastern District of Wisconsin, not being a licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, hereby admits that he willfully engaged in the business of dealing in firearms, in violation of Title 18, United States Code, Sections 922(a)(1)(A) and 924(a)(1)(D).

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## **PENALTIES**

7. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fines: five years' imprisonment; and a $250,000 fine. The Court may also impose up to three years of supervised release. The charge also carries a mandatory special assessment of $100.

6

8.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9.     The parties understand and agree that in order to sustain the charge of dealing in firearms without a license, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant did not have a federal firearms license;

Second, the defendant engaged in the business of selling firearms; and

Third, the defendant did so willfully.

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The defendant acknowledges and agrees that his attorney has discussed the potentially applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties

7

acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

16. The parties agree that the base offense level in this case is 12 under Sentencing Guidelines Manual § 2K2.1(a)(7).

## Number of Firearms

17. The parties agree that a ten-level increase under Sentencing Guidelines Manual § 2K2.1(b)(1)(E) applies to the offense level for the offense charged in the Information because the offense involved 200 or more firearms.

8

<u>**Acceptance of Responsibility**</u>

18.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), and to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) (assuming an offense level of 16 or greater), but only if the defendant exhibits conduct consistent with those provisions.

<u>**Sentencing Recommendations**</u>

19.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

20.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

21.     The parties agree to recommend that the Court sentence the defendant to a three-year term of probation.

<u>**Court's Determinations at Sentencing**</u>

22.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

9

23. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

24. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

25. The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form.

### Special Assessment

26. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### Forfeiture

27. The defendant agrees that the following items listed in the information filed in this case constitute the proceeds of the offense to which the defendant is pleading guilty or was property used to facilitate such offense:

    a.    KelTec, CNC Industries, Inc. P32 pistol, CAL: 32, SN: 08412;

10

b. Remington Arms Company, Inc. 770 rifle, CAL: 7 SN: M71806285;

c. Savage A22 rifle, CAL: 22, SN: K221327;

d. Hatfield Gun Company SGL shotgun, CAL: 410, SN: 410S20-001753;

e. Ithaca Gun Co. 66 shotgun, CAL: 20, SN: 104606;

f. Winchester 37 shotgun, CAL: 20, SN: none;

g. Raven Arms P25 pistol, CAL: 25, SN: 135052;

h. Remington Arms Company, Inc. 870 shotgun, CAL: 12, SN: A210298M;

i. Ruger LC9S pistol, CAL: 9, SN: 452-61202;

j. KelTec, CNC Industries, Inc. P32 pistol, CAL: 32, SN: 24D0P84;

k. Iberia Firearms JCP Pistol, CAL: 40, SN: X7160099;

l. HS Produkt (IM Metal) XD9 pistol, CAL: 9, SN: US922525;

m. Mossberg 500 Shotgun, CAL: 20, SN: U325365;

n. Italy 15 Rifle, CAL: Unknown, SN: NG7982;

o. Boito/ER Amantino/IGA Uplander shotgun, CAL: 410, SN: 457563;

p. HS Produkt Echelon pistol, CAL: 9, SN: BE240632;

q. Sarsilmaz (SAR Arms) B6C pistol, CAL: 9, SN: T1102-21G00377;

r. HS Produkt (IM Metal) XD45 pistol, CAL: 45, SN: US799867;

s. Walther Colt Government pistol, CAL: 22, SN: WD048541;

t. SIG Sauer (SIG-Arms) P320 M18 pistol, CAL: 9, SN: M18A032868;

u. Ithaca Gun Co. 66 shotgun, CAL: 20, SN: 660780754;

v. Remington Arms Company, Inc. 870 shotgun, CAL: 12, SN: D500577M;

w. Henry Repeating Rifle Company H002 rifle, CAL: 22, SN: 004456;

x. Ruger Single-Six revolver, CAL: 22, SN: 261-01544;

y. Ruger Mini-14 Ranch rifle, CAL: 223, SN: 195-00829;

z. Boito/ER Amantino/IGA The Grand shotgun, CAL: 12, SN: J531195-14;

aa. Unknown shotgun, CAL: Unknown, SN: 89;

bb. Smith & Wesson SD40VE pistol, CAL: 40, SN: DUX5224;

cc. Cobra Ent., Inc./Kodiak Ind CB380 Derringer, CAL: 380, SN: CT195668;

dd. Unknown CTGE revolver, CAL: 32, SN: Unknown;

ee. Unknown revolver, CAL: Unknown, SN: Unknown;

ff. Savage Stevens 94 shotgun, CAL: 20, SN: Obliterated;

gg. Remington Arms Company, Inc. 552 rifle, CAL: 22, SN: A1920363;

hh. Hawk Industries Inc. Pardner Pump shotgun, CAL: 12, SN: NV508867;

ii. FNH USA, LLC FNX-45 pistol, CAL: 45, SN: FX3U198937;

jj. CBC (Companhia Brasiliera de Cartuchos) Rossi shotgun, CAL: 410, SN: SP494428;

kk. Savage Arms Inc. (CD) 62 rifle, CAL: 22, SN: 0003352;

ll. Ruger 10/22 rifle, CAL: 22, SN: 0001-82537;

mm. Spike's Tactical, LLC ST15 rifle, CAL: multi, SN: SHM007972;

nn. Savage 99 rifle, CAL: 300, SN: 426719;

oo. KelTec, CNC Industries, Inc. P32 pistol, CAL: 32, SN: CT431; and

pp. Savage 14 1/2 Little S rifle, CAL: 22, SN: none.

11

The defendant agrees to the forfeiture of these items of property and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in the listed property items.

### DEFENDANT'S WAIVER OF RIGHTS

28. In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

29.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

30.     The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

31.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

32.     Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the

13

conduct to which the defendant has admitted does not fall within the scope of the statutes or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

## GENERAL MATTERS

33.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

34.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

35.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

36.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

37.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the

14

government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

38. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

15

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 5/21/2025

MICHAEL G. CEMAN
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 5/28/2025

JOHN W. CAMPION
Attorney for Defendant

For the United States of America:

Date: 5/29/2025

RICHARD G. FROHLING
Acting United States Attorney

Date: 5·28·25

ROBERT J. BRADY, JR.
Assistant United States Attorney

16